UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, SS                                CIVIL ACTION NO.: 05-40134 FDS

*****************************************
DIANE BOOTH and JAMES BOOTH,
          Plaintiffs,
v.

WILLIAM F. SCANNELL, JR., ESQ.;
          Defendant.

*****************************************

### PLAINTIFF, DIANE BOOTH AND JAMES BOOTHS' REQUEST FOR DEFAULT JUDGMENT PURSUANT TO FED.R.CIV.P.55(b)(2)

Now come the Plaintiffs, Diane Booth and James Booth and herewith move this Honorable Court for a default judgment for damages pursuant to Fed.R.Civ.P.55(b)(2). In support thereof the Plaintiffs, Diane Booth and James Booth, set forth the following:

1. On January 5, 2006 this Honorable Court entered an Order of Default against the Defendant, William F. Scannell, Jr., for failure to plead or otherwise defend as provided by Rule 55(a).

2. Pursuant to said Order/Notice of Default and pursuant to the Standing Order regarding Motions for Default Judgment, the Plaintiffs, Diane Booth and James Booth herewith respectfully move for a Default Judgment and for assessment of monetary damages against the Defendant, William F. Scannell, Jr.

3. This is an action for legal malpractice against the Defendant, William F. Scannell, Jr., Esquire, stemming from his failure to properly prosecute/litigate a tort claim

on behalf of Diane Booth and James Booth, which ultimately resulted in its dismissal. The Statute of Limitation has also run. As such, the Plaintiffs, Diane Booth and James Booth, were denied their rightful recovery against the tort defendants.

4. The Plaintiffs, Diane Booth and James Booth, now respectfully move this Honorable Court for a Judgment of Default and assessment of damages. In support thereof, the Plaintiffs submit the attached Affidavits and Default Judgment form.

WHEREFORE, the Plaintiffs, Diane Booth and James Booth, herewith respectfully move this Honorable Court for Entry of Judgment in their favor as against the Defendant, William F. Scannell, Jr., Esquire in an amount to be determined by the Court, together with interest.

Respectfully submitted,
Diane Booth and James Booth
By their attorney,

Christopher N. Hug, Esq.
BBO #: 546960
The Law Office of
Christopher N. Hug
P.O. Box 961237
Boston, MA 02196

Dated: January 24, 2006

## CERTIFICATE OF SERVICE

      I, Christopher N. Hug, Esquire, hereby certify that I have this day mailed, postage prepaid, a copy of the within documents, directed to:

William F. Scannell, Jr., Esquire
79 Park Avenue – Unit 7
Worcester, MA 01608

**Signed under the pains and penalties of perjury, this 24th day of January 2006.**

_____
Christopher N. Hug, Esq.

# Sworn Affidavit of Diane R. Booth

My name is Diane R. Booth, and I currently live at 11565-D Decatur Street, Westminster, CO, 80234. My former Massachusetts address was, 112 Overlook Drive, Leominster, MA 01453.

On March 6, 1997, I was employed at ACT company located in Hudson, MA through Tara Professionals, a temporary agency located in Stowe, MA. I had returned to the work force in October of 1996 by accepting the position of a temporary to permanent offering of a Solder Wave Operator. This required the active and repetitive duty of lifting PC boards varying in size and weight from a few square inches, weighing a pound or two to a board measuring 18" by 24" in size and weighing up to 50 pounds. I had been at ACT for approximately 6 months at that time and my temporary position was due to go permanent within a week or two of this March 6th date.

On that day, March 6th, 1997, I was proceeding to lunch by taking a frequently used stairway that led from the first floor to the second floor where the cafeteria was located. As I stepped to the landing halfway up the staircase, I tripped, falling into a concrete wall. I struck the right side of my head, shoulder, elbow and knee. The force of the impact was sufficient to break my glasses and cause cuts and abrasions to my face (right cheek and nose area) and right knee. I immediately felt a tingling sensation in the tips of the fingers of my right hand that did not subside. ACT summoned an ambulance and I was taken to Marlborough Hospital where I was X-Rayed and examined. After several hours, I was released with prescriptions for muscle relaxants and anti-inflammatories and deemed unable to return to work, pending evaluation.

I was assigned to the Medworks Industrial Accident program for follow-up and seen by Christine A. Lesthamp on 3/10/1997. Ms. Lesthamp's evaluation concluded a right trapezius strain and contusions of the right shoulder and elbow. She transferred care to TakeCharge Occupational Health Clinic at Leominster Hospital and Dr. John Murphy. I was then prescribed 4 visits of physical therapy to be administered at Worcester County Rehab. in Leominster, beginning on 3/21/97. Their evaluation supported the right trapezius strain and contusions but also noted that I had very limited usage of my right arm.

On 3/24/97, I was seen again by Dr. Murphy, who had the same diagnoses and concluded that I would be unable to return to work at that time. I was scheduled for a reevaluation on 4/7/97 and in the interim, sent to see an Orthopedic specialist, Dr. Garry Greenfield in Leominster. Dr Greenfield felt as though I had suffered an impairment to the rotator cuff of my right shoulder and wanted an MRI to further test his theory. The MRI was scheduled and I was restricted from work until 4/26/97. The MRI was completed along with a bone scan on 4/24/97 and yielded normal results. I was never furnished the results of the initial bone scan. Dr. Greenfield further restricted my going back to work until at least 5/24/97. During this time my right elbow and arm continued to swell and I

experienced excruciating searing pain with an increasing burning sensation. The usage of my right arm continued to diminish.
In mid-May of 1997, an EMG test was performed, also returning as normal and I was referred to Dr. Daniel Tanenbaum, a Physiatrist, located at Fairlawn Rehabilitation Hospital in Worcester, MA for ongoing treatment.

Over the next two years, under the care of Dr. Tanenbaum, I was unable to return to work experienced a steady, painful decline of the usage of my right arm. The pain levels were (on an increasing scale of 1-10) constantly in the 8 range, spiking to 10. My right hand began to develop into a claw and I was constantly cradling and protecting my injured right extremity, terrified that I or someone else would bump it and cause the pain to escalate. Even the slightest sensation of a gentle breeze blowing across my arm would cause the same burning, searing pain to flare. My skin took on a mottled orange hue and sleep became an impossibility. During these same two years, I was seen by a bevy of physician's as Dr. Tanenbaum strove to find relief for me. Among the various players came a Vascular Surgeon, who diagnosed T.O.S. and referred me to another physician located in Boston who specialized in T.O.S. The doctor recommended surgery to correct the problem. I was also sent to a Boston Neurosurgeon who said my condition was a result of 2 herniated discs and ultimately recommended surgery as well. During this time, my arm was incapacitated in a Hemi Harness and I was placed in a hard cervical collar. In July and September of 1998, I had epidural injections (with reactions) and in October I was seen by Dr. Glazer (Boston Neurosurgeon) who again recommended surgery to repair a perceived disc problem.

Dr. Tanenbaum ordered a myelogram and a CT scan and advised against any surgical procedure. He classified me, at this point, as having reached a level of Maximum Medical Improvement and recommended Occupational Therapy sessions to learn how to manage my pain levels and to compensate for my disability.

In January of 1999, I was sent to Dr. Bennet Blumenkopf, a Neurosurgeon located at Memorial Health Care (U-Mass Medical) in Worcester, MA. Dr. Blumenkopf reviewed the myelogram and MRI's and concluded that my pain, disability had developed into a condition called Reflex Sympathetic Dystrophy (RSD). He recommended I see yet another Neurosurgeon specializing in the shoulder area out of the U-Mass Pain Clinic.

From February through July of 1999, I was under the care of the U-Mass Pain Clinic and received ongoing Stellate Ganglion Blocks to attempt the relief of the RSD. The procedures had varying degrees of success and I was issued a Pulse Galvanic Stimulator (PGS) unit to try and control the pain. A PGS is an electronic unit that employs a battery pack that is connected to adhesive patches via wires. I also had an elbow sleeve and a glove that I could use as well. This was now my life. Every four to five weeks I would have to be driven from Leominster to Worcester and spend the morning receiving the Stellate Ganglion Block. In between times, I remained tethered to the PGS unit and taking many and varied forms of anti-inflammatories, anti-depressants, sleeping pills as well as many others that didn't have any effect on my condition.

I was not able to work, I was not able to sleep, I was not able to perform any of my household responsibilities. I had only the limited ability to cook or otherwise care for my family. I could not drive due to the use of the PGS unit and the medications I was taking. My daughter was approximately three and a half at the time of my injury and by this time she was approaching five years old and I had never been able to pick her up during that time. I was in extreme pain, I was depressed and I wasn't getting any better. As of July of 1999, my husband had been out of work since the prior August. He had been solely responsible for my care and transportation since the time of the initial injury and had to take regular and increasing blocks of time off to deal with either my injuries or the care of our daughter. Our monetary resources were dwindling rapidly and we were in danger of losing our home. We knew we had to make a change. I have family in Colorado and we made the difficult decision to move there as there would be a stronger support system for myself and my daughter than we had in Massachusetts. Our thought was that if there were others who could assist in my care, then my husband could concentrate more on his job (when he found one) and spend less time on my ongoing and increasing needs.

Upon moving to Colorado in July of 1999, I came under the care of Dr. Peter Reusswig and his Pain Management clinic in Thornton, CO. I have undergone Stellate Ganglion Blocks, Bier Blocks, Thermograms and a variety of other tests and Phentolomine drips every 4 weeks. Dr Reusswig supported the diagnoses of RSD and began a long, grueling fight with the Workman's Compensation company, Liberty Mutual, to get the care and treatment that I needed. After almost six years of this, I have no relief of the condition and pain is controlled only through the implantation of a Spinal Cord Stimulator implanted in December of 2003 and replacing the Phentolomine drips.. My condition will never change for the better with the possibility of further deterioration. The RSD has also spread from my right arm to my left and while not as severe, causes pain and suffering as well. I have never been able to return to work and in March of 2005, I was deemed totally disabled.

I have never been able to enjoy the quality of life that I once did. I can never again engage in the activities that gave me pleasure such a s painting, needlepoint or any other task that utilizes fine motor skills. I have missed out on the small things of parenthood with my daughter that can never be repeated or recovered.

In 2000, Attorney William Scannell filed a Personal Injury suit against ACT on my behalf alleging that the stairway where I was injured had been poorly lit and perhaps out of code due to the height of the landing. During my time at ACT I had been told that several people had tripped at the same location. From the filing of the suit through November of 2004, there was little or no contact with Attorney Scannell. His communications diminished rapidly after our move to Colorado and he finally stopped responding to all efforts to contact him by telephone, fax, email or written letter. Finally in 2004, I filed a grievance against him with the Board of Bar Overseers in Boston. This was a task that I didn't want to do, but felt compelled to do so. Upon investigation and summoning of records from Attorney Scannell, I learned that the Personal Injury suit had been dismissed due to his negligence in providing the court with necessary documentation. Upon appeal, Attorney Scannell once again failed to provide the

requested documentation and the proceedings were dismissed. At no time during this process did Attorney Scannell ever inform me of the activities surrounding my case. I have never had any further contact with Attorney Scannell and as a result of the investigation of the Board of Bar Overseers, Attorney Scannell has been suspended for a year and a day. My current attorney, Christopher Hug, has made aware of the fact that in Massachusetts, the original case must be deemed "winnable" in order to succeed in a malpractice claim, I feel as though I was never represented properly by Attorney Scannell from the outset. If the case was never presented properly, there is never the chance to learn if the outcome could have been favorable. In other words, in order to determine if you could win the game, first you must be able to play. Conditions have been further compromised as I have learned that the ACT company has gone out of business in the interim.

My quality of life will never return to the levels experienced before my injury and I will never again experience gainful employment. My wage at the time of injury, almost eight years ago now and at a temporary level, was $10.00 per hour. It would have increased once I had been accepted as a permanent employee. My calculations on lost wages for prior and future time periods even based on the initial $10.00 per hour are as follows.

$10.00/hr x 40 hours = $400/wk
$400/wk x 52 weeks = $20,800/yr
$20,800/12 = $1,733.33/mo

Past wages would be:
1997 = $15,600 (9 months @ $1,733.33/mo)
1998 – 2005 = $145,600 (7 years @ $20,800/yr)

Future wages to age 65 would be:
2006 – 2022 = $353,600 (17 years @ $20,800/yr)

Total for these periods would be $514,800.00

Thank you for allowing me the time to express my opinions and to detail my situation.

Signed under the Pains and Penalties of Perjury

*Diane R. Booth*
Diane R. Booth

# Sworn Affidavit of James P. Booth

My name is James P. Booth and I live at 11565-D Decatur Street in Westminster, CO. At the time of my wife's injury, I too lived at 112 Overlook Drive in Leominster, MA.

I can add little to my wife's narrative except to say that I have had to stand by and watch the pain and suffering that she has endured since March 6th, 1997. I can attest to the facts presented and add that this entire experience has had a profound effect on our relationship on a whole as well as my job performance. Beginning with job performance, I have been employed in the Financial Services industry since 1982 and found the injury to my wife to be the most challenging period. As a result of Diane's injury it became necessary for me to take time of from work on a regular basis. This caused friction where I worked, stress for me and contributed to the eventual loss of the job. My wife always observed me as being happy, content and easy-going. After Diane's accident, my constant concern has worn on me to the point where I feel as though I will always be guarded. It has been a physically, mentally and monetarily draining 8 year period. The periods of extreme concern, frustration and anger have only deepened over time.

Our relationship has suffered, as can be expected, when one partner has experienced a debilitating physical injury. No longer can we engage in the activities that we once did. Diane was my companion in all things. She would accompany me when I went fishing, helping me with moving and paddling our canoe and enjoying the sport of fishing almost as much as I did. The canoe has been long been sold and Diane can no longer manipulate a fishing rod. The loss of that particular activity may sound trivial in the grand scope of her injury, but it's illustrative of the changes that have affected our lives at all levels. No longer can we think of anything without wondering how Diane's arms will be affected. I will always have to be aware of where her pain levels are and what her mental state might be as we go forward in our life together.

Watching my wife suffer through extreme pain and mental anguish has been a source of extreme frustration on my part. I can only stand by and support her as best I can. The failure of Attorney Scannell to act in her best interest and to abandon her the way he has done has left her angry and upset. It's my hope that actions against Attorney Scannell may proceed and that my wife will receive some degree of closure and justice.

Signed under the Pains and Penalties of Perjury

*James P. Booth*
James P. Booth

**Appendix A**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Diane Booth and James Booth
―――――――――――――――――
**Plaintiff(s)**

v.   CIVIL ACTION NO. 05-40134 FDS

William F. Scannell, Jr., Esq.
―――――――――――――――
**Defendant(s)**

FORM OF
DEFAULT JUDGMENT

_____, D.J.

Defendant _____ having failed to plead or otherwise defend in this action and its default having been entered,

Now, upon application of plaintiff and affidavits demonstrating that defendant owes plaintiff the sum of $_____ that defendant is not an infant or incompetent person or in the military service of the United States, and that plaintiff has incurred costs in the sum of $_____.

It is hereby ORDERED, ADJUDGED AND DECREED that plaintiff recover from defendant __ _____ the principal amount of $_____, with costs in the amount of $_____ and prejudgment interest at the rate of _____% from _____ ____to_____ in the amount of $_____ for a total judgment of $_____ _____ with interest as provided by law.

By the Court,

Dated:_____        _____
                             Deputy Clerk

NOTE: For the current post judgment interest rate call 202-273-2168

3